UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RUTH VIRGINIA BARRON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 05-1517 |
| ) | |
| WASHINGTON COUNTY CHILDREN ) | |
| AND YOUTH SOCIAL SERVICE ) | ELECTRONICALLY FILED |
| AGENCY, CHRISTY CROSS, individually ) | |
| and in her capacity as Caseworker II for ) | |
| Washington County Children and Youth ) | |
| Social Service Agency, FAMILY CARE FOR ) | |
| CHILDREN & YOUTH, INC., DEBORAH ) | |
| A. McALLISTER, individually and in her ) | |
| capacity as Regional Director of Family Care ) | |
| for Children & Youth, Inc., JAMIE L. ) | |
| LEGAS, individually and in her capacity as ) | |
| Supervisor for Family Care for Children & ) | |
| Youth, Inc., and TAMARA SMITH, ) | |
| individually and in her capacity as Case ) | |
| Manager for Family Care for Children & ) | |
| Youth, Inc., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Pending before the Court is a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), filed by Defendants Family Care for Children & Youth, Inc. ("FCCY"), Deborah A. McAllister, Jamie L. Legas and Tamara Smith.[1]  For the reasons discussed below, the Motion is denied.

I.   INTRODUCTION

   A.   Factual Background[2]

In 2002, Plaintiff Ruth Virginia Barron became an approved foster parent with

---

[1] Ms. McAllister is identified as Regional Manager for FCCY, Ms. Legas as a Supervisor, and Ms. Smith as a Case Manager.  Each has been sued in her individual as well as official capacity.

[2] Unless otherwise indicated, the facts in this section are taken from the Complaint.

1

Defendant Family Care for Children & Youth, Inc. ("FCCY"), and Washington County Children and Youth Social Service Agency ("CYS.")  Keith Crawford, whose parental custody had been severed in a court action brought by CYS, was placed in Ms. Barron's care as of August 2002 under an agreement between Plaintiff and FCCY.

Soon after Ms. Barron took custody of Keith, she noticed aberrant behavior she believed was related to the fact that the eleven-year old child had been prescribed six different medications by Dr. Farheen Fahim, a psychiatrist.  When Keith later developed an ulcer, his pediatrician ordered all but one of the psychiatric medications be stopped.  Ms. Barron subsequently noticed "a vast improvement" in the child's mental functioning.  He also "began to disclose disturbing recollections of his previous foster home, along with his memory of Dr. Fahim pressuring him to believe that his parents had sexually abused him."  (Plaintiff's Brief in Opposition to Defendants' . . . Motion to Dismiss, Docket No. 19, "Plf.'s Brief," at 3-4.)

During the next visit to Dr. Fahim, when Keith began crying uncontrollably, Ms. Barron stated that she wanted to remain with him during his examination.  She also attempted to explain the changes in medication and Keith's perception of his prior treatment.  Ms. Barron was ordered out of the room and, when Keith continued to cry, was told to take the child with her.

Pursuant to the foster care agreement, Ms. Barron reported the incident at Dr. Fahim's office and her conclusions about the child's over-medication to both CYS and FCCY.  Ms. Christy Cross, a caseworker for CYS,[3] and/or Ms. McAllister, Ms. Legas, and Ms. Smith, informed Plaintiff that Keith would not be returned to his natural parents despite his wish to do so, accused her and the child of lying, and threatened to remove him from her care if she did not refill the medications.  Soon thereafter, Ms. Barron received a letter from Ms. Legas questioning her compliance with the

---

[3] Defendants CYS and Ms. Cross have not joined in the motion to dismiss by Defendants FCCY, Ms. McAllister, Ms. Legas and Ms. Smith.  Therefore, the term "Defendants" herein does not refer to CYS or Ms. Cross unless otherwise stated.

2

FCCY policy regarding twenty-four supervision of the child. Plaintiff admits that the letter was not threatening per se, but contends that it "clearly conveyed the strong recommendation that Ms. Barron adhere to company policy and served as notice that her foster parent activities, now suspect, were subject to even stricter scrutiny." (Plf.'s Brief at 5.)

Prior to a parental rights hearing scheduled for mid-September 2003, Ms. Barron filed a sworn affidavit with the Orphans Court describing the situation, and expressing a desire for both herself and Keith to testify. Neither Ms. Barron nor the child was allowed to testify at the hearing. Shortly after filing the affidavit, however, Ms. Barron met with Ms. McAllister on September 16, 2003, to discuss concerns that Plaintiff was not following FCCY policies, in particular the fact that she discontinued the child's medication without informing FCCY or CYS, a claim Ms. Barron denied. She was also criticized for filing the affidavit in which she "put FCCY down."

Ms. Barron subsequently learned Dr. Fahim had reported the office incident to CYS and FCCY, and expressed her opinion that Plaintiff was senile and no longer fit to provide foster care. Plaintiff also discovered that someone had reported her to CYS and FCCY for allowing another adult (allegedly a prior felon) to live with her in violation of FCCY policy. Ms. Barron contends that neither of those allegations was true.

On September 24, 2003, Ms. Legas arrived at Ms. Barron's home and explained that she was there to remove Keith because he was in danger, i.e., living in the same home with a felon. Despite Ms. Barron's insistence that no one else was living at the house except herself and Keith, Ms. Legas searched the home until she discovered the belongings of the alleged houseguest. Although Ms. Barron explained that he was simply storing his possessions there temporarily, she was accused of lying and the child was forcibly removed against his will.

Ms. Barron unsuccessfully appealed Keith's removal from her care. On October 29, 2003, Ms. Legas advised Plaintiff that FCCY was revoking Ms. Barron's eligibility as an approved foster parent with their agency. Plaintiff believes Defendants have since spread false rumors about her

fitness as a foster parent to child care agencies in neighboring counties.

    B.    <u>Procedural History</u>

Plaintiff filed suit in this Court on October 31, 2005, alleging violation of her rights under the First Amendment to the United States Constitution, intentional interference with an economic opportunity, and intentional infliction of emotional distress.  Defendants filed the subject motion to dismiss on February 6, 2006.  (Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6), Docket No. 5, "Mot. Dis.")

    C.    <u>Jurisdiction and Venue</u>

This Court has jurisdiction pursuant to 28 U.S.C. § § 1331 and 1343(2) by virtue of the claims brought under § 1983; jurisdiction over the state law claims is established pursuant to 28 U.S.C. § 1367 inasmuch as those causes of actions are part of the same case or controversy as the constitutional claims.  Venue is appropriate here because the events underlying the suit took place in the Western District of Pennsylvania.

## II.    STANDARD OF REVIEW

In deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), all factual allegations and all reasonable inferences therefrom must be accepted as true and viewed in a light most favorable to the plaintiff.  <u>Colburn v. Upper Darby Twp.</u>, 838 F.2d. 663, 665-666 (3d Cir. 1988).  In ruling on a motion to dismiss, the court must decide whether there are sufficient facts pled to determine that the complaint is not frivolous, and to provide the defendants with adequate notice to frame an answer.  <u>Id</u>. at 666.  A motion to dismiss will be granted only if it appears that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45 (1957).

## III.    LEGAL ANALYSIS

    A.    <u>Count I:  Violation of Plaintiff's Constitutional Rights – Section 1983</u>

Section 1983 of the Civil Rights Act of 1866 provides that "every person who, under color of [state law] subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity." 42 U.S.C. § 1983.  It is well-established that Section 1983 itself does not create substantive rights, but provides a vehicle by which violation of rights created by the Constitution or federal law may be vindicated. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979); Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997).  To state a claim under § 1983, a plaintiff must show that: (1) the defendant was a "person" who acted under "color of state law" and (2) the defendant's conduct deprived the plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535 (1981).

In Count I, Ms. Barron alleges that Defendants "sought to prevent or chill the exercise of Plaintiff's right to speak out in the best interest of the minor foster child in her care by retaliatory conduct contrary to the First Amendment of the United States Constitution." (Complaint, ¶ 23.) Ms. Barron alleges that Defendants (along with CYS and Ms. Cross), have, *inter alia*, "encourage[d] and/or tolerat[ed] the practice of retaliating against approved foster caregivers who petition the government and/or otherwise speak out in the best interest of a minor child and/or critically comment on agency performance."  She also alleges that FCCY "failed to protect the rights of the Plaintiff to truthfully inform the court of the welfare of children under her care." (Complaint, ¶¶ 25.c-d.) Plaintiff alleges that Defendants' acts of forcibly removing Keith from her home, terminating her foster care contract with FCCY, and spreading rumors about her mental condition and fitness to act as a foster parent were taken in retaliation for her protected actions in speaking out about what she believed was improper medical care and her desire to testify at the September 2003 parental rights hearing.

Defendants argue that Count I should be dismissed as a matter of law because Family Care

for Children & Youth, Inc., is a private corporation and did not act under color of state law. (Mot. Dis., ¶ 6.) Moreover, they argue, Plaintiff has failed to plead a "close nexus" between FCCY and the government agency, Washington County CYS, or that FCCY was acting at the instruction of the state in taking the alleged actions against Plaintiff.[4] (Id., ¶ 8.) Finally, they argue that even if FCCY were determined to be acting under color of state law, Ms. Barron's First Amendment retaliation claim must fail because the speech in question – her concerns about Keith's over-medication and treatment by Dr. Fahim – was merely an extension of her individualized grievance, not a matter of public concern entitled to First Amendment protection. (Id., ¶ ¶ 9-18.)

In support of their first argument, Defendants rely on the recent decision by the Third Circuit Court of Appeals in Leshko v. Servis, 423 F.3d 337 (3d Cir. 2005). In that case, the foster child, Karen Leshko, was severely burned while living with Greg and Judy Servis after having been removed from the custody of her natural mother and placed in foster care. Upon reaching her majority, Leshko sued the Servises, Dauphin County Social Services for Children and Youth, the County, and various County officials under § 1983 for depriving her of her Fourteenth Amendment to be free from physical harm. The only question before the Court of Appeals was whether foster parents are state actors for purposes of establishing liability under § 1983. Leshko, 423 F.3d at 338-339. The Court concluded that they are not, despite their contractual relationship with the social services agency which, under Pennsylvania law, identified them as "employees" of that government unit. Leshko, 423 F.3d at 342.

We find Defendants' reliance on Leshko misplaced for several reasons. First, Defendants' reading of the case is too broad in that the Court of Appeals addressed only the relationship

---

[4] The Court need not address this argument in detail because, as the Supreme Court has noted, there are actually four tests for ascertaining whether a private entity is liable under Section 1983, i.e., the "public function" test, the "state compulsion" test, the "nexus" test, and the "joint action" test. Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1983). As discussed above, Plaintiff alleges that the violation of her First Amendment rights was a joint action by Defendants CYS and FCCY.

between the government and the foster parents themselves. The Leshko Court based its decision in large part on the fact that providing foster care was not traditionally "an exclusive public function of the state," but rather an activity which had long been shared by private charitable institutions and individuals. Here, the activity in question is not providing the day-to-day care that foster parents offer, but rather supervision of foster parents in those cases where the child has been removed from his home by state action. *See* Harris v. Litz, CA No. 04-3890, 2005 U.S. Dist. LEXIS 40965, *16-*19 (E.D. Pa. June 16, 2005) (private agency was potentially liable under § 1983 not by virtue of the contractual relationship between itself and the state per se, but rather because it was performing a function traditionally the prerogative of the state, i.e., placement of a child in the foster home.) We also find this case more factually similar to Estate of Earp v. Doud, CA No. 96-7141, 1997 U.S. Dist. LEXIS 6702 (E.D. Pa. May 7, 1997) than to Leshko. One of the defendants in Earp, like FCCY, was a private agency which placed the plaintiff in a foster home where he died. Distinguishing between foster care agencies and foster parents, the court held that the agency and its employees were state actors by virtue of the fact that the state had removed the child from his parents and thus had a governmental obligation to provide him with a safe haven, a duty it contractually delegated to the agency. Id., *5-*6.

Second, the Court of Appeals in Leshko noted that "no tangible benefit flowed to Pennsylvania through the Servises." Leshko, 423 F.3d at 341. Here, however, by virtue of the alleged contract between Washington County CYS and FCCY, it may well be that the government does derive benefits from the private agency. As a hypothetical example, it may be that Washington County finds it more economical to contract with a specialty service which provides supervision of foster parents on an as-needed basis rather than directly hiring its own full-time social workers and case managers. Because the contract between the Defendant agencies is not in evidence, however, the benefits to the state cannot be determined at this point.

Third, Plaintiff alleges that the Defendant agencies acted together in violating her

7

constitutional right to free speech. (Complaint, ¶¶ 21, 23-24.) In Leshko, the Court considered only one of two recognized situations in which the action of a private entity may be attributable to the state, that is, those involving an "actor that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." It did not consider those cases which involve "an activity that is significantly encouraged by the state or in which the state acts as a joint participant." Leshko, 423 F.3d at 340. The Court pointed out that in the latter category, "[d]etermining state action in such cases requires tracing the activity to the source to see if that source fairly can be said to be the state. The question is whether the fingerprints of the state are on the activity itself." Id. As the Supreme Court has acknowledged, determining whether the acts of an ostensibly private actor can be classified as conduct "fairly attributable to the state" requires a detailed factual inquiry. *See* Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1983), pointing out that no matter which test is used, the analysis is "necessarily fact-bound." Again, we find it too early in the development of this case to undertake this factual inquiry.

Defendants further argue that Plaintiff has failed to state a claim for First Amendment retaliation because the speech in question was not a matter of public concern. (Mot. Dis., ¶¶ 9-13.) Defendants argue that Ms. Barron's "speech," i.e., her belief that Keith was over-medicated and "not all together," simply reflects a clash of opinions with the child's legal guardian, CYS, and his treating psychologist. Because Ms. Barron has no medical or psychological expertise on which to base such views, her complaints are nothing more than an extension of her individualized grievances and not protected by the First Amendment. (Id., ¶¶ 14-18.)

To establish a First Amendment retaliation claim, the plaintiff must demonstrate that (1) the speech was protected, i.e., addressed a matter of public concern, and (2) the speech was a substantial or motivating factor in the alleged retaliatory action. Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004). "A public employee's speech involves a matter of public concern if

it can be 'fairly considered as relating to any matter of political, social or other concern to the community.'" Curinga, 357 F.3d at 313, *quoting* Green v. Phila. Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997). On the other hand, speech which does nothing more than express personal grievances is not protected. Connick v. Myers, 461 U.S. 138, 149 (1983) ("the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.")

Here, Plaintiff alleges that her speech was intended to bring to public attention her belief that FCCY and/or CYS were allowing foster children to be over-medicated, that they were ignoring Keith's desire to be returned to his natural parents without giving him a full hearing, and that when she attempted to testify about these matters at the parental rights hearing by filing an affidavit with the Orphans Court, FCCY retaliated by unjustly accusing her of violating agency policies then forcibly removing the child from her care. (Complaint, ¶¶ 13-16, 23-24.)

The Court concludes that at this point, Plaintiff has satisfactorily pled a claim that Defendants retaliated against her for expressing her concerns about matters which fall within the scope of public concern. Defendants' motion to dismiss Count I is therefore denied.

B.      Count II:  Intentional Interference with an Economic Opportunity

Plaintiff alleges that "the facts previously outlined constitute the state tort of intentional interference with an economic opportunity"[5] and that "as a result of this conduct, Plaintiff suffered damages as previously outlined." (Complaint, ¶¶ 28-29.) Although not a model of clarity, the Court concludes that Plaintiff's Complaint – read in its entirety – alleges that Defendants

---

[5] Pennsylvania does not identify the actions alleged by Plaintiff herein as "intentional interference with an economic opportunity." *Compare* Varrallo v. Hammond Inc., 94 F.3d 842, 848 and n9 (3d Cir. 1996), in which the Third Circuit recognized five elements of a *prima facie* case for tortious interference with economic opportunity under New Jersey law: (1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) a causal connection between the interference and the loss of prospective gain, (4) actual damages, and (5) defendant's knowledge of plaintiff's expected advantage. Because Defendants have interpreted Plaintiff's allegations as a claim for intentional interference with (prospective) contractual relations, the Court will address their arguments in those contexts.

interfered with her contractual relations with children and youth service agencies in Washington and/or adjacent counties. (Complaint, ¶ 20.)

To state a claim for tortious interference with existing contractual relations under Pennsylvania law, the plaintiff must allege: (1) the existence of a contractual relation between herself and a third party; (2) purposeful action on the part of the defendant specifically intended to harm that existing relation; (3) the absence of privilege or justification on the part of the defendant; and (4) actual legal damage to the plaintiff as the result of the defendant's conduct. *See* Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1998). It is clear from the face of the Complaint that Ms. Barron is not alleging tortious interference with her then-current contract with Washington County because she clearly states that her contractual relationship (if any) was with Family Care for Children & Youth, Inc., i.e., "On or about August 26, 2002, minor foster child Keith Crawford . . . was placed into Ms. Barron's care, *as per a foster care agreement with Family Care*." (Complaint, ¶ 8, emphasis added.) She does not allege that at the time of the events in question she had a contract with any other state child care agency or foster care placement agency. Since the contract in question must be between the plaintiff and a third party, to the extent Ms. Barron has stated a claim for tortious interference with any contract, it must be with a prospective contract.

To state a claim for interference with prospective contractual relations, a plaintiff must allege: (1) the existence of a prospective contractual relation between herself and a third party; (2) purposeful action on the part of the defendant, specifically intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) actual legal damage as a result of the defendant's conduct, and (5) a reasonable likelihood that the relationship would have occurred but for the interference of the defendant. Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998) *citing, inter alia,* Pelagatti, *supra*, and Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979).

Defendants interpret Count II as a claim of interference with prospective contractual

relations, and argue that Plaintiff has failed to allege (1) that she had any other prospective contractual relationships to provide such services; (2) that FCCY took any action to interfere with such relationships, and (3) that she incurred actual harm as a result of the alleged interference. Therefore, Count II must be dismissed with regard to the claims against FCCY. (Mot. Dis., ¶ ¶ 19-25.)

As the Third Circuit Court of Appeals has noted, "a 'prospective contractual relation' is, by definition, not as susceptible of precise, exacting identification as is an existing contract." Kachmar v. Sungard Data Sys., 109 F.3d 173, 184 (3d Cir. 1997) (internal citations omitted.) However, the Court has also noted that under Pennsylvania law, there must be "an objectively reasonable probability that a contract will come into existence," that is, "something more than a 'mere hope." Id. *citing* Thompson Coal, 412 A.2d at 471. Ms. Barron has alleged that she believes

> Defendants have since leaked the false information regarding her fitness as a foster parent to other neighboring agencies [and] as a result of her now damaged reputation, Ms. Barron's right and ability to voluntarily submit herself and her home for the purpose of providing foster care in Washington and Monroeville [sic] Counties has been dramatically infringed.

(Complaint, ¶ 20.)

The Court concludes that for purposes of surviving a motion to dismiss, Ms. Barron has stated a claim that Defendants' alleged act of spreading inaccurate information to agencies in other counties about her ability to act as a foster parent has interfered with her prospective ability to enter into contracts with those agencies. Since she was previously approved by Washington County and FCCY to provide such services, we also conclude that there was "an objectively reasonable probability" that she could have contracted with other agencies to provide the same services, absent Defendants' alleged actions. Ms. Barron also claims that she suffered actual harm, e.g., loss of income, as a result of Defendants' actions. (Complaint, ¶ 26.) Therefore Defendants' motion to dismiss Count II must be denied.

    C.    <u>Count III: Intentional Infliction of Emotional Distress</u>

Under Pennsylvania law, to state a claim for intentional infliction of emotional distress, a plaintiff must allege conduct which: (1) was extreme and outrageous; (2) was intentional or reckless; and (3) caused severe emotional distress.  Hoy v. Angelone, 720 A.2d 745, 753-754 (Pa. 1998).[6]  The Pennsylvania Supreme Court has adopted the view of the Superior Court that "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Hoy, 720 A.2d at 754, *quoting* Buczek v. First National Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987).

Defendants argue that Count III must be dismissed because Plaintiff has failed to allege physical, injury, harm or illness caused by any action on the part of an FCCY Defendant, nor has she adequately pled that FCCY acted with extreme or outrageous conduct.  (Mot. Dis., ¶¶ 26-30.)

Although we recognize that few if any courts have found that a defendant's actions were "beyond all possible bounds of decency" and "utterly intolerable in a civilized society," we conclude that for the purposes of deciding the motion to dismiss, Plaintiff has sufficiently alleged that she was severely emotionally distressed as a result of the "emotionally charged removal" of the child from her home and the "accusations of lying, senility, insubordination and false charges of noncompliance with foster care rules." (Plf.'s Brief at 23-24.)  Defendants' motion to dismiss Count III is therefore denied.

In conclusion, the Motion to Dismiss by Defendants Family Care for Children & Youth, Inc.,

---

[6] In Hoy, the Pennsylvania Supreme Court expressly declined to adopt the definition of the tort of intentional infliction of emotional distress as stated in Restatement (Second) of Torts § 46(1), going only so far as to "assum[e] arguendo, that the tort exists." Hoy, 720 A.2d at 753 n10; *see also* Reeves v. Middletown Athletic Ass'n, 866 A.2d 1115, 1122 (Pa. Super. Ct. 2004) (stating that "[t]here remains some question as to whether the courts of this Commonwealth recognize a cause of action for intentional infliction of emotional distress.")  The reluctance by the Supreme Court to declare the legal existence of the tort, however, has not deterred federal courts in Pennsylvania from considering such claims.  *See, e.g.,* Timm v. Manor Care, Inc., CA No. 06152, 2006 U.S. Dist. LEXIS 11342, *15-*16 (W.D. Pa. Mar. 20, 2006); Odom v. Borough of Taylor, CA No. 05-341, 2006 U.S. Dist. LEXIS 8948, *20-*22, (M.D. Pa. Feb. 21, 2006); and Martin v. Comunale, CA No. 03-6793, 2006 U.S. Dist. LEXIS 1692, *4-*5 (E.D. Pa. Jan. 18, 2006).

Deborah A. McAllister, Jamie L. Legas and Tamara Smith is denied without prejudice, that is, Defendants may raise these same objections to the Complaint following discovery.  An appropriate order follows.

s/Arthur J. Schwab  
Arthur J. Schwab  
United States District Judge  
for  
William L. Standish  
United States District Judge

cc:   Peter M. Suwak, Esq.  
P. O. Box 1  
Washington, PA 15301  
Email: pmsuwakesq@comcast.net

Stewart H. Sostmann, Esq.  
Marshall, Dennehey, Warner, Coleman  
 & Goggin  
600 Grant Street, USX Tower  
Suite 2900  
Pittsburgh, PA 15219  
Email: shsostmann@mdwcg.com

Joyce Hatfield-Wise, Esq.  
Washington County Children and  
 Youth Social Service Agency  
100 West Beau Street, Suite 502  
Washington, PA 15301